UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| SILVERBACK APPLIED TECHNOLOGIES, LLC, | ) ) ) |
| Plaintiff, | ) ) |
| vs. | ) )  Case No. 1:21-cv-1215-_____ |
| HIGHPOINT DIGITAL, INC. f/k/a HIGHPOINT GLOBAL | ) ) ) ) |
| Defendant. | ) ) |

**COMPLAINT
FOR BREACH OF CONTRACT
AND DECLARATORY RELIEF**

COMES NOW, Plaintiff Silverback Applied Technologies, LLC ("SAT") and files this Complaint for Breach of Contract and Declaratory Relief against Highpoint Digital, Inc., f/k/a Highpoint Global, LLC ("Highpoint") and in support thereof states as follows:

**PARTIES**

1. Plaintiff SAT is a Maryland limited liability company whose sole member, Paul Kapinos, is a resident of Maryland. SAT is, therefore, a citizen of Maryland.

2. Defendant Highpoint is a Virginia corporation with its principal place of business in Indiana and is the successor in interest of Highpoint Global, LLC. Highpoint is a citizen of Virginia and Indiana.

1

## JURISDICTION AND VENUE

3. Plaintiff seeks in excess of $75,000 in damages.

4. The Court has jurisdiction pursuant to 28 U.S.C. § 1332, as the parties are diverse and the amount in controversy exceeds $75,000.

5. The Court has jurisdiction over the request for Declaratory Judgment pursuant to 28 U.S. Code § 2201, *et seq.*, as there is an actual controversy within the Court's jurisdiction.

## STATEMENT OF CLAIM

### Introduction

6. This matter arises from a relationship between Highpoint and various entities in which Paul Kapinos was involved, relating to continuous provision of outside staffing to work under the direction of Highpoint's internal corporate information technology ("IT") group in support of Highpoint's provision of services under a Federal Training, Quality, and Content Contract (the "TQC Contract") with the Centers for Medicare & Medicaid Services ("CMS").

7. The consistent purpose throughout these contractual relationships was that Mr. Kapinos, through various corporate entities, would act as a staffing company to provide outside skilled corporate IT professionals to perform IT work as directed and supervised by Highpoint's internal corporate IT group in support of the TQC Contract. The number of professionals provided and the entities through which these outside IT professionals were provided changed over the years, but the basic purpose of the relationship did not.

8. This dispute relates to the most recent written agreement for provision of these outside corporate IT staffing services to Highpoint, breached by Highpoint when it spuriously alleged breaches of the agreement in an effort to terminate the agreement early in violation of its terms and thereby avoid further payments required under the agreement.

## The Centers for Medicare & Medicaid Services' Training, Quality, and Content Contract

9. Beginning in February 2013, Highpoint Global, now known as Highpoint Digital, Inc., was the prime contractor for the TQC Contract issued by the CMS (contract no. HHSM-500-2013-00099C) pursuant to which Highpoint provides training to Customer Service Representatives that support Medicare and the Affordable Care Act.

## Highpoint Engages Moser To Provide Two Corporate IT Full-Time Equivalent Employees

10. In March 2013, shortly after receiving the TQC Contract, Highpoint decided to form an internal corporate IT group to support of its overall business, including those aspects related to the TQC Contract.

11. Highpoint hired Paul Kapinos as an employee in its internal IT group to provide critical IT support to Highpoint, including for the TQC Contract among other duties.

12. At that time, Mr. Kapinos was also employed by Moser Consulting ("Moser"), which provided IT staffing and consultation services.

13. At Mr. Kapinos's suggestion, Highpoint engaged Moser to provide outside staffing needed to develop and support Highpoint's internal corporate IT group.

14. Highpoint engaged Moser to provide two Baltimore, Maryland based Full-Time Equivalent employees ("FTE") to provide IT support to Highpoint's Indianapolis, Indiana based internal corporate IT group. The two Moser FTE's worked at the direction of, and under the supervision of, Highpoint's internal corporate IT group.

15. These two outside IT staffers were provided without any formalized written agreement or statement of work. Fees for their work were invoiced to Highpoint and paid on a monthly basis.

**Highpoint's Business Grows and Its FTE Needs Increase**

16. By December 2013, as Highpoint's business continued to grow exponentially as a result of the TQC work, Highpoint sought to increase the number of Moser supplied FTE positions to supplement its internal corporate IT group.

17. Initially, Highpoint discussed Moser providing a total of 17 FTE's to perform all of the corporate back-office IT support functions, but subsequently determined that it would maintain two FTE's as employees of Highpoint's internal corporate IT group, with all other FTE staffing being provided through Moser. Highpoint continued to direct and supervise the work of all FTE's.

18. To further its efforts to move employees from Highpoint's payroll to indirect outside vendor costs, Highpoint also approached Kapinos requesting that he be compensated for his consulting duties to Highpoint as an employee of Moser whose time would be billed to Highpoint by Moser. Notwithstanding this change in employer, Kapinos' duties would remain essentially unchanged.

19. Based upon those discussions, as formal written agreements were still being prepared, Highpoint "terminated" many of its internal corporate IT group employees so that Moser could directly hire them as part of the 15 FTE's providing outside IT support. These former Highpoint employees then continued performing the same IT support tasks as before, but now as employees of Moser instead of Highpoint.

20. Under this latest reorganization, which was implemented in January 2014, Moser continued to provide back-office corporate IT services to Highpoint in support of Highpoint's provision of services pursuant to the TQC Contract but now with Moser providing staffing for the 15 FTE's. Highpoint paid Moser $1,038,862 per month for this staffing level and this arrangement

continued through July 2014. As before, Highpoint continued to direct and supervise the work of all FTE's. As before, this agreement was unwritten.

### Highpoint Introduces the Statement of Work

21. In anticipation of a need to reduce the arrangement with Moser to writing, on February 28, 2014, Highpoint generated the first version of the proposed Statement of Work ("SOW") at issue in this matter. The SOW was an encyclopedic listing of the generic scope of IT support services and deliverables that might be requested from IT staff providing back-office corporate IT services of the type that Moser and Kapinos were providing to Highpoint at the time. As such, the SOW was not a checklist of work to be performed, but more of a list of services from which Highpoint could choose, subject to the reasonable capacity of the number of FTE's employed, as it supervised and directed the outside FTE employees.

22. Notwithstanding its breadth, the SOW did not include reference to some of the responsibilities already being handled by Moser FTE's for Highpoint, including responsibilities for SharePoint development, that Moser took over from Highpoint starting in January 2014. The SOW was thus, both over and under inclusive, in terms of the work actually being requested and performed.

### Highpoint Reduces the Number of FTE's Being Provided by Moser

23. In March 2014, just two months after the prior reorganization was implemented, Highpoint again sought to adjust the relationship, this time to reduce the monthly cost being paid to Moser. After negotiations, Moser and Highpoint agreed to: revise the unwritten agreement to $792,500 per month retroactive to January 1, 2014; reduce the number of FTE's from 15 to 12; and transfer the duties previously handled by the three Moser outside FTE's being eliminated to

in-house Highpoint employees in its internal corporate IT group. At the time, those three positions were still in the process of being filled by Moser, who then stopped recruitment.

24. Notwithstanding this significant reduction in Moser's outside staff and the transfer of those duties from Moser to Highpoint's internal staff, no changes were made to the proposed Statement of Work, it being understood by the parties as unnecessary because the 12 remaining Moser outside FTE's would continue to perform only such tasks, and only prepare such Deliverables, as reasonably assigned to them by Highpoint's internal corporate IT group.

### Moser and Highpoint Enter Their First Written Agreement

25. In May 2014, as Highpoint was preparing for a financial audit, it requested that Moser execute a formal written contract for the outside corporate IT services that were already being provided to satisfy its need to have documentation for the audit.

26. Highpoint and Moser first entered into a written agreement on June 2, 2014, with a revised version being executed by both parties on July 22, 2014.

27. The terms and conditions of the agreement between Moser and Highpoint were memorialized in a "Purchase Order" (the "Highpoint/Moser Agreement"), which included as an attachment the encyclopedic Statement of Work. All work performed by Moser's outside FTE's before the execution of the June 2, 2014 agreement was done without reference to a SOW and the work assigned to and performed by Moser's outside FTE's did not change subsequent to the agreement despite the addition of the SOW.

28. Following execution of the Highpoint/Moser Agreement, Highpoint's internal corporate IT group continued to assign, direct, and supervise the work performed by Moser's outside FTE's just as had been the case since the beginning of the relationship.

29. The term of Highpoint/Moser Agreement was coterminous with the TQC Contract, such that the Highpoint/Moser Agreement continued to renew automatically year to year under the same terms for as long as Highpoint continued to perform the TQC Contract, unless the Highpoint/Moser Agreement was otherwise terminated pursuant to its termination provision.

30. This arrangement under the modified 2014 Highpoint/Moser Agreement continued for approximately the next four years without significant change.

### Highpoint Seeks to Transfer the Highpoint/Moser Agreement to a "Small Business"

31. In or about December 2017, Highpoint informed Mr. Kapinos and Moser that in order to comply with federal regulations and contracting requirements, Highpoint had determined that it was beneficial for it to move the subcontract for the FTE's providing outside corporate IT support to a "small business."

32. In order to facilitate Highpoint's goals, Mr. Kapinos agreed to provide the same services as were then being performed by Moser, through Silverback Applied Technologies, Inc. ("SAT"), an entity that Mr. Kapinos had previously formed and which qualified as a "small business."

33. It was contemplated by the parties that SAT (as Highpoint's subcontractor) would separately engage Moser (as SAT's subcontractor) to provide the same IT personnel who had been providing services under the previous arrangement. The contract price and terms were to otherwise remain the same.

34. In effect, the relationship between Highpoint and Moser would remain the same, but SAT would step in as a "small business" intermediary. No material changes were to be made to the SOW or other contract terms.

35.   Prior to finalizing these negotiations, SAT began providing services and billing Highpoint based upon the terms of the Highpoint/Moser Agreement.

36.   Highpoint and SAT thereafter started to negotiate a new written agreement for the provision of the outside FTE's to support Highpoint's internal corporate IT group.

### Highpoint Further Reduces the Number of FTE's To Four

37.   While the new written contract reflecting the substitution of SAT for Moser as the party directly contracting with Highpoint was being prepared, Highpoint again indicated it wanted to reduce the amount paid for outside staffing that supported its internal corporate IT group with a concomitant transfer of duties in-house.

38.   At the outset of the negotiations for the new Highpoint/SAT Agreement it was agreed, understood, and intended by the parties that the Highpoint/SAT Agreement would provide for the same outside staffing services, using the identical 12 Moser employees, as existed between Highpoint and Moser just prior to the termination of the Highpoint/Moser Agreement. It was further understood that the SOW attached to the Highpoint/Moser Agreement would be carried forward materially unchanged in the Highpoint/SAT Agreement, which contemplated that Highpoint would continue to direct and manage the tasks performed and deliverables assigned to 12 outside IT personnel (now under contract to SAT but still employed by Moser) just as it had done previously since the relationship began in 2013.

39.   However, during the March 2018 negotiations, in order to reduce the amount paid to the outside vendor (now SAT), Highpoint indicated a desire to reduce the number of FTE positions to be provided by SAT from 12 to four. As part of that effort to move payroll inside Highpoint instead of continuing to pay an outside vendor, Highpoint sought a waiver of the "Non-solicitation of Employees" provision of the agreement which prohibited Highpoint from hiring

Moser's employees. Highpoint wanted to hire several of Moser's employees, then being provided through SAT, to perform the same tasks but now as Highpoint in-house employees as part of its internal corporate IT support group.

40. This change was consistent with Highpoint's decision to significantly expand its internal corporate IT department as reflected in its acquisition of an IT focused company shortly before this FTE reduction.

41. SAT and Moser agreed to a one-time waiver of the "Non-solicitation of Employees" provision to allow Highpoint to directly employ certain Moser staff members who continued to perform the same tasks but were now paid directly by Highpoint.

42. Despite this material change in manpower and responsibility (from 15 FTE's, to 12 FTE's, and now to four FTE's) and the fact that several Moser staff members were now performing the same tasks but as direct Highpoint employees, there was no corresponding change to the SOW, consistent with the understanding of the parties that the SOW provided an encyclopedic generic scope of types of work that could be assigned to IT professionals, subject to reasonable expectations regarding what the number of outside FTE's contracted from SAT could accomplish in normal work hours.

43. As SAT had already been providing 12 FTE's in the interim and numerous invoices at the prior rate had already been paid, Mr. Lanius on behalf of Highpoint agreed to maintain the prior per month pricing for six months and to continue utilizing all 12 SAT/Moser FTE's, implementing the reduction effective August 1, 2018.

44. The Highpoint/SAT Agreement was memorialized as a Professional Services Agreement ("PSA"), as prepared on or about March 16, 2018 but was back-dated to February 1, 2018 (the "2018 Highpoint/SAT Agreement") attached as **Exhibit 1**, with amendments.

### The Terms of the 2018 Highpoint/SAT Agreement

45. Just as had been the case with the Highpoint/Moser Agreement, the 2018 Highpoint/SAT Agreement was coterminous with the TQC Contract, such that the terms of the 2018 Highpoint/SAT Agreement continued automatically year to year for as long as Highpoint continued to perform the TQC Contract, unless the 2018 Highpoint/SAT Agreement was otherwise properly terminated according to its terms.

46. Specifically, the 2018 Highpoint/SAT Agreement provides that unless it is terminated early in accordance with Article 30's termination provision, "the exercise of a renewal option of [Highpoint's] TQC Contract by CMS shall automatically extend this Contract for an option period which is coterminous with the option period of [Highpoint's] TQC Contract," such that absent the parties' agreement upon a revision of the terms of the agreement, the terms of the prior TQC option period (each referred to in the 2018 Highpoint/SAT Agreement as a "Contract Line Item" ("CLIN")) automatically extend to the new TQC option period. **Ex. 1** Art. 29.

47. The 2018 Highpoint/SAT agreement further provides that in compensation for the outside IT staffing provided, Highpoint would pay to SAT a fixed annual sum, referred to in the agreement as the Contract Line Item, for each year that the TQC Contract was renewed unless the parties agreed otherwise in writing and amended the agreement accordingly. **Ex. 1**, Art. 7 as amended, Art. 28, Art. 29.

48. The 2018 Highpoint/SAT Agreement also contains the same "Non-solicitation of Employees" provision as previous agreements, preventing Highpoint from directly hiring the outside staffing provided by SAT. **Ex. 1**, Art. 24. ("Non-solicitation Provision").

49. Highpoint's right to terminate the agreement was limited to two circumstances: (1) termination of the TQC Contract by CMS, or (2) default by SAT. **Ex. 1** Art. 30(a)&(b).

### Highpoint and SAT Execute Amendments
### Providing Annual Compensation for Future Contract Years

50. On or about July 31, 2018, Mr. Kapinos and Mr. Lanius agreed in writing, electronically signed by both parties, upon fixed annual payment amounts ("Contract Line Items") for future contract years. **Exhibit 2** – July 31, 2018 E-mail Agreement. Specifically, the parties agreed Highpoint would pay SAT: $5,582,344 for contract year 2018 – 2019 (Option Year 6), $5,569,323 for contract year 2019 – 2020 (Option Year 7), $5,312,667 for contract year 2020 – 2021 (Option Year 8), and $5,297,695 for contract year 2021 – 2022 (Option Year 9).

51. Subsequently, Highpoint prepared a more formal amendment memorializing the amount previously agreed upon for contract year 2018 – 2019 (corresponding to TQC Option Period 6). **Ex. 1**, Amendment 1.

### Scope of Work for the Highpoint/SAT Agreement

52. Notwithstanding that the original cohort of 15 outside IT staff to be provided by the outside staffing organization had by August 2018 been reduced to four, with several of SAT's former employees now performing the same tasks for Highpoint in-house, the Statement of Work was never materially modified. Nor was a modification required because as had always been true, the contract did not require the outside staffing organization to complete all tasks listed in the SOW. Instead, the SOW listed a menu of potential tasks and deliverables from which Highpoint could select and direct the subcontracted corporate IT staff to provide, recognizing that such tasks and deliverables were limited to those that could be reasonably completed by the number of outside IT staff then currently being provided.

53. Since the start of Highpoint's need for outside corporate IT staff, the parties, including SAT's predecessor Moser, negotiated the number of FTE's that would be provided to

Highpoint and not the services to be provided. At all times, Highpoint directed what skill sets Moser had to provide in the FTE's and directed and supervised their work.

54. After the March 2018 negotiations, Highpoint and SAT continued to operate under these terms and understandings for the next two years.

### The Highpoint/SAT Agreement Renewed By Its Terms for Another Year on August 1, 2019.

55. On August 1, 2019, the Highpoint/SAT Agreement would have renewed automatically at the annual rate previously agreed upon. However, recognizing that certain declines in Highpoint's corporate IT needs that had been anticipated did not occur, Highpoint proposed that the parties amend their prior agreement which had provided for a modest decrease in the amount paid to SAT, and instead proposed keeping the rate for 2019 – 2020 the same as was paid for 2018 – 2019. SAT accepted this adjustment which kept the annual payment at $5,582,344. The increase from the amount previously agreed was memorialized in a formal amendment to the agreement. **Ex. 1**, Amendment 2.

56. For contract year 2019 – 2020, there were no changes in the scope of work or number of outside IT staff being provided.

### Highpoint Attempts to Improperly Terminate the Highpoint/SAT Agreement

57. On or about April 10, 2020, Highpoint (through Mr. Lanius) reached out to SAT (through Mr. Kapinos) and indicated that Highpoint wanted to further reduce the amount paid to SAT for outside corporate IT staffing and to find a way for Highpoint to bill the work being performed by SAT directly to the government under the TQC Contract. Very preliminary discussions in this regard began thereafter, but the parties were unable to agree upon an arrangement that was acceptable.

58. Apparently deciding that rather than continuing to negotiate a further reduction in the fees it paid to SAT, Highpoint determined that it would accomplish its new goals by attempting to terminate the 2018 Highpoint/SAT Agreement entirely.

59. On or about June 17, 2020, Highpoint suddenly and without warning, issued a Notice of Default ("Default Letter"), pursuant to Article 30(b) of the PSA. **Ex. 1**, Art. 30; **Exhibit 3**, Notice of Default Letter.

60. The Default Letter disingenuously claimed that SAT had failed to perform the contracted services and provide the required deliverables. **Ex. 3** p. 1.

61. The Default Letter purported to demand a detailed plan to cure the breaches but observed that because it claimed that SAT's failures to perform were "historical and pervasive," (*i.e.* going back to 2013) it did not see how any such plan could be effective. **Ex. 3,** p. 3.

62. Highpoint's Default Letter grossly misrepresented SAT's obligations under the 2018 Highpoint/SAT Agreement and previous agreements as contemplated by the parties in the formation of those agreements and as demonstrated by the parties' course of conduct over numerous years. Highpoint was now for the first time claiming that each task and deliverable included in the Statement of Work was to be performed by SAT regardless of how many outside IT staff were contemplated under the Highpoint/SAT Agreement. The Statement of Work had been unchanged when outside staff was reduced from 15 to 12 to 4. This reading ignored the course of conduct stretching back nearly seven years during which Highpoint directed SAT/Moser IT staff and assigned them tasks and deliverables within the Statement of Work to complete. Highpoint even claimed deficiencies related to tasks which had been performed by SAT/Moser staff until those staff members and the tasks they performed were brought in-house by Highpoint (along with a reduction in compensation being paid to SAT/Moser) when Highpoint had sought

and obtained a one-time waiver of the non-solicitation provision so that it could directly hire SAT/Moser's staff in 2018.

63. The Default Letter was also deficient in that it failed to adequately identify or provide copies of any instructions from Highpoint assigning participation or involvement in a task that an SAT outside staff member had allegedly not completed; failed to identify any Services or Deliverables actually assigned by Highpoint to SAT that were not provided by SAT within the time specified in the Highpoint/SAT Agreement, Statement of Work, or approved project plans incorporated into the Statement of Work; failed to identify any Deliverable that SAT was assigned to provide that was rejected by Highpoint; and failed to identify or attach any notice of rejection delivered to SAT within a reasonable time after the work was performed. **Ex. 1**, Art. 5. ("Buyer shall accept the Deliverables or give Seller notice of rejection within a reasonable time after the Delivery Date."); **Ex. 3.**

64. In fact, prior to the June 17, 2020 Default Letter, Highpoint had never rejected any Services or Deliverables provided by SAT/Moser, as required by Art. 5 of the 2018 Highpoint/SAT Agreement, nor provided any indication that the Services or Deliverables were not completed to Highpoint's satisfaction. **Ex. 1**, Art. 5.

65. In the few instances in which issues arose, the parties had amicably worked together to create satisfactory solutions.

66. In short, the Default Letter was a thinly veiled pretext to terminate the 2018 Highpoint/SAT Agreement, and the Default Letter was issued without cause.

67. Despite the baseless and disputed grounds claimed in the Default Letter, and reserving its rights to contest the validity of the alleged default, on June 30, 2020, SAT responded to the Default Letter with a comprehensive 25-page Cure Plan proposing to resolve any and all

deficiencies without prejudice to the defense to Highpoint's misinterpretation of SAT's obligations under the Statement of Work, upon presentation of adequate information from Highpoint specifying how each generically described breach failed to meet the requirements of the Highpoint/SAT Agreement, so that appropriate remedies could be determined and executed. **Exhibit 4,** June 30, 2020 Cure Letter.

68. On July 8, 2020, Highpoint responded to SAT's Cure Plan without substantive explanation, simply claiming that the plan offered in the Cure Letter was insufficient and was rejected. Highpoint failed to review the proposed cure plan in good faith and rejected it in bad faith. **Exhibit 5**, July 8, 2020 Letter.

69. SAT challenged Highpoint's baseless rejection of the comprehensive cure plan in a further response on July 15, 2020. **Exhibit 6**, July 15, 2020 Letter.

70. Thereafter, the Parties engaged in discussions regarding potential resolution to the dispute, which were ultimately unsuccessful.

### Highpoint Made Partial Payment for the 2020/2021 Contract Year and Then Breached its Payment Obligation.

71. On August 1, 2020, the 2018 Highpoint/SAT Agreement renewed automatically by its terms as amended. As it had done for the previous two years, Highpoint continued paying SAT based on an annual rate of $5,582,344 rather than the previously agreed $5,312,667 for contract year 2020 – 2021 (Option Year 8). By its course of conduct, Highpoint superseded the July 31, 2018 agreement by paying the higher amount and is obligated to continue payments at that rate.

72. In August 2020, SAT continued to provide four outside IT staff who continued to perform services as directed by Highpoint. At the end of August 2020, SAT invoiced Highpoint for $465,195.00 (based on the annual rate of $5,582,344) for services provided in August 2020 as

set forth in the 2018 Highpoint/SAT Agreement. Highpoint paid the invoiced amount in full--$465,195.00 for August 2020 without objection.

73. On September 17, 2020, Highpoint terminated SAT's staff's access to Highpoint's computer systems thereby preventing them from continuing to provide IT service to Highpoint and declared that the PSA had been "deemed terminated for default."

74. On October 1, 2020, SAT invoiced Highpoint for $465,195.00, based on the same agreed upon annual rate in effect since August 1, 2018 and paid by Highpoint the previous month.

75. Highpoint thereafter failed to pay the entire amount due and owing for September 2020 and instead paid $255,857.25, presumably a *pro-rated* sum approximately equal to the 17 days of September after which Highpoint prevented SAT's staff from providing services. ($465,195.00 divided by 30 days times 17 days).

76. In accordance with the provisions of the 2018 Highpoint/SAT Agreement, when Highpoint failed to pay the September fees, SAT gave notice of the failure to pay the amounts due.

77. Highpoint indicated it did not intend to pay anything further to SAT despite the fact that CMS had not terminated its TQC Contract with Highpoint. Consistent with its position, Highpoint has not paid SAT the remaining balance of the September 2020 payment or any amount due under the contract thereafter, thus breaching its contractual obligations.

78. Highpoint has materially breached its obligations under the PSA.

79. SAT has been damaged as a result of the breach, including the amounts owed for the remaining months in 2020/2021 contract year (Contract Line Item 4), plus the full contract year 2021/2022 (Contract Line Item 5), and for the periods of any extensions of the TQC Contract that would have been required under the 2018 Highpoint/SAT Agreement as a result of corresponding extension under the TQC contract. **Ex. 1,** Art. 29.

80. Highpoint has indicated its intent to hold SAT to the obligations of the 2018 Highpoint/SAT Agreement, including the non-competition provision of Article 6 and other provisions identified in Article 41, despite Highpoint's material breach of the obligations of the 2018 Highpoint/SAT Agreement.

## COUNT I
## BREACH OF CONTRACT

81. Plaintiff incorporates by reference paragraphs 1 through 80, above.

82. Highpoint and SAT entered into an agreement for the provision of professional IT staffing services, which was reduced to writing in the 2018 Highpoint/SAT Agreement, as amended.

83. SAT has fulfilled all of its obligation under the 2018 Highpoint/SAT Agreement as contemplated by the parties.

84. Highpoint materially breached the 2018 Highpoint/SAT Agreement by, *inter alia*, prematurely terminating the contract in violation of its terms, by issuing a Notice of Default without grounds, failing to accept the proposed Cure Plan in good faith, failing to pay the amounts due and owing, and otherwise failing to comply with its obligations under the agreement.

85. As a direct result of Highpoint's breaches of the 2018 Highpoint/SAT Agreement, SAT has suffered damages in excess of $10.5 Million, including the amounts owed for the remaining months in the 2020/2021 contract year (Contract Line Item 4), all amounts owed for the 2021/2022 contract year (Contract Line Item 5), and for the future periods that would have been required under the 2018 Highpoint/SAT Agreement as a result of a corresponding extension of the TQC Contract.

WHEREFORE, Silverback Applied Technologies, LLC, respectfully requests that this Court enter a judgment in its favor and against Highpoint Digital, Inc. in an amount sufficient to

compensate it for its injuries as may be demonstrated at trial, plus pre and post judgment interest, attorneys' fees and costs, and such other and further relief as the cause may require.

## COUNT II
## DECLARATORY JUDGMENT
## (in the alternative)

86. Plaintiff incorporates by reference paragraphs 1 through 85, above.

87. There is an actual controversy regarding the Parties' rights as governed by the 2018 Highpoint/SAT Agreement.

88. Plaintiff seeks a declaratory judgment declaring the rights and obligations of each party under the 2018 Highpoint/SAT Agreement, including but not limited to a declaratory judgment that Highpoint breached its obligations under the 2018 Highpoint/SAT Agreement and/or alternatively that SAT is not bound by any restrictions or provisions imposed by the 2018 Highpoint/SAT Agreement.

WHEREFORE, Silverback Applied Technologies, LLC, respectfully requests that this Court declare the rights and obligations under the 2018 Highpoint/SAT Agreement specifically declaring that:

1. Highpoint materially breached its obligations of the 2018 Highpoint/SAT Agreement;

2. Highpoint's Notice of Default, pursuant to Article 30(b), was without legitimate basis and violated Highpoint's obligations under the 2018 Highpoint/SAT Agreement;

3. SAT fully complied with its responsibilities under the 2018 Highpoint/SAT Agreement;

4. SAT is entitled to recover compensation for contract years 2020/2021 and 2021/2022 (Contract Line Items 4 and 5) and any future extensions of the TQC Contract;

5. SAT is entitled to a total annual payment of $5,582,344 for each such contract year (Contract Line Item) to the extent not already paid and for each extension period; and/or alternatively

6. Effect on September 17, 2020, SAT is and was no longer bound by any terms or provisions of the 2018 Highpoint/SAT Agreement including that SAT is no longer bound by Article 6 or any Article referenced in Article 41.

Plaintiff further requests that the Court enter a judgment in its favor and against Highpoint Digital, Inc. in an amount sufficient to compensate it for its injuries as may be demonstrated at trial, plus pre and post judgment interest, attorneys' fees and costs, and such other and further relief as the cause may require.

Respectfully submitted,

*Offer Korin*
Offer Korin (Atty No. 14014-49)
KATZ KORIN CUNNINGHAM PC
334 N. Senate Avenue
Indianapolis, IN 46204
Office: 317-464-1100
Fax: 317-464-1111
E-Mail: okorin@kkclegal.com

Harold M. Walter (PHV To Be Filed)
Gregory Emrick (PHV To Be Filed)
OFFIT KURMAN
300 E. Lombard Street, Suite 2010
Baltimore, MD 21202
Office: 410-209-6400
Fax: 410-209-6435
E-Mail: hwalter@offitkurman.com
E-Mail: gregory.emrick@offitkurman.com

*Counsel for Plaintiff Silverback Applied Technologies, LLC*